**Nos. 22-80061, 22-80062, and 22-80063**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

IN RE JUUL LABS, INC. MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION

---

From an Order Certifying Plaintiff Classes Entered by the United States District Court for the Northern District of California

The Honorable William H. Orrick, Judge
Case No. 19-MD-02913-WHO; MDL No. 2913

---

# PLAINTIFFS' CONSOLIDATED ANSWER IN OPPOSITION TO DEFENDANTS' PETITIONS FOR PERMISSION TO APPEAL GRANT OF CLASS CERTIFICATION PURSUANT TO FED. R. CIV. P. 23(f)

---

Dena C. Sharp
Scott M. Grzenczyk
GIRARD SHARP LLP
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800

Dean Kawamoto
KELLER ROHRBACK L.L.P.
1201 Third Ave., Ste. 3200
Seattle, WA 98101
Telephone: (206) 623-1900

Sarah R. London
LIEFF CABRASER HEIMANN & BERNSTEIN
275 Battery Street, Fl. 29
San Francisco, CA 94111
Telephone: (415) 956-1000

Ellen Relkin
WEITZ & LUXENBERG
700 Broadway
New York, NY 10003
Telephone: (212) 558-5500

*Counsel for Plaintiffs-Respondents*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .................................................. viii

INTRODUCTION ..........................................................................................1

BACKGROUND ...........................................................................................1

I. Summary of Claims ...............................................................................2

II. Experts' Analysis ...................................................................................4

III. Defendants' Roles .................................................................................7

ARGUMENT ................................................................................................8

I. Plaintiffs' California Law Fraud Claims: The District Court's Decisions Concerning Class Exposure and Materiality Were Grounded in Applicable Law and Relevant Facts, Both of Which Defendants Ignore. ......................................................................8

A. The District Court Did Not Refuse to Address Relevant Factual Disputes. ...........................................................................9

B. Certification Did Not Depend on Exposure to Third-Party Social Media Content. ..............................................................13

C. Uniform Materiality Among Class Members Is Not Required Under California Law. ..........................................................15

II. Plaintiffs' RICO Claims: Defendants' Arguments Are Meritless and Are Focused on RICO, Not on Class Certification Issues. .................19

A. There Are No *Comcast* Issues Warranting Interlocutory Review. ..........................................................................19

B. Defendants' Causation Arguments Do Not Raise Class Certification Issues .......................................................28

**TABLE OF CONTENTS**
**(cont'd)**

**Page**

III. Defendants "Death Knell" Arguments Do Not Support 23(f) Review. .....37

CONCLUSION .....39

# TABLE OF AUTHORITIES

## CASES

*Amchem Prod., Inc. v. Windsor*,
521 U.S. 591 (1997)....................33

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)....................10, 27, 32

*BCS Servs., Inc. v. Heartwood 88, LLC*,
687 F.3d 750 (7th Cir. 2011)....................25

*Blair v. Equifax Check Servs., Inc.*,
181 F.3d 832 (7th Cir. 1999)....................37

*Bokaie v. Green Earth Coffee LLC*,
No. 18-CV-05244-JST, 2018 WL 6813212 (N.D. Cal. Dec. 27, 2018)....................35

*Bridge v. Phoenix Bond & Indemnity Co.*,
553 U.S. 639 (2008).................... 28, 29, 30, 33

*Cadle Co. v. Flanagan*,
No. 3:01CV1909 (AVC), 2005 WL 8167447 (D. Conn. Feb. 11, 2005)....................34

*Chamberlan v. Ford Motor Co.*,
402 F.3d 952 (9th Cir. 2005).................... 1, 31, 34, 36, 37, 38

*Cnty. of Oakland v. City of Detroit*,
866 F.2d 839 (6th Cir. 1989)....................34

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013).................... 19, 20, 21, 24, 25, 26, 28

*Doug Grant, Inc. v. Greate Bay Casino Corp.*,
232 F.3d 173 (3d Cir. 2000)....................33, 34

*Ebner v. Fresh, Inc.*,
838 F.3d 958 (9th Cir. 2016)....................17

**TABLE OF AUTHORITIES**
**(cont'd)**

**Page**

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Management, Inc.*,
618 F.3d 1025 (9th Cir. 2010) ....................26

*Gutierrez v. Carmax Auto Superstores California*,
19 Cal. App. 5th 1234 (Cal. Ct. App. 2018) ....................16

*Hadley v. Kellogg Sales Co.*,
324 F. Supp. 3d 1084 (N.D. Cal. 2018) ....................8

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
392 U.S. 481 (1968) ....................34

*Holmes v. Sec. Inv. Prot. Corp.*,
503 U.S. 258 (1992) ....................29, 33

*In re Arris Cable Modem Consumer Litig.*,
327 F.R.D. 334 (N.D. Cal. 2018) ....................20

*In re First Alliance Mortg. Co.*,
471 F.3d 977 (9th Cir. 2006) ....................24

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2008) ....................13

*In re Hyundai and Kia Fuel Economy Litig.*,
926 F.3d 539 (9th Cir. 2019) ....................24

*In re JUUL Labs, Inc. Mktg., Sales Prac., & Prod. Liab. Litig.*,
497 F. Supp. 3d 552 78 (N.D. Cal. 2020) ....................8, 20

*In re JUUL Labs, Inc. Mktg., Sales Prac., & Prod. Liab. Litig.*,
533 F. Supp. 3d 858 (N.D. Cal. 2021) ....................7, 8, 20

*In re Light Cigarettes Mktg. Sales Pracs. Litig.*,
271 F.R.D. 402 (D. Me. 2010) ....................18

**TABLE OF AUTHORITIES**
**(cont'd)**

**Page**

*In re Suboxone (Buprenorphine Hydrochlorine and Naloxone) Antitrust Litig.*,
967 F.3d 264 (3d Cir. 2020) ....................25

*In re Tobacco II Cases*,
46 Cal. 4th 298 (2009) ....................18

*In re U.S. Foodservice Inc. Pricing Litig.*,
729 F.3d 108 (2d Cir. 2013) ....................32

*Indus. Bldg. Mats., Inc. v. Interchemical Corp.*,
437 F.2d 1336 (9th Cir. 1970) ....................23

*Jimenez v. Allstate Ins. Co.*,
765 F.3d 1161 (9th Cir. 2014) ....................19

*Mazza v. Am. Honda Motor Co.*,
666 F.3d 581 (9th Cir. 2012) ....................15

*McLaughlin v. Am. Tobacco Co.*,
522 F.3d 215 (2d Cir. 2008) ....................18

*Oki Semiconductor Co. v. Wells Fargo Bank, N.A.*,
298 F.3d 768 (9th Cir. 2002) ....................22, 23, 33

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) .................... 10, 12, 13, 26

*Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd.*,
943 F.3d 1243 (9th Cir. 2019) ....................29, 30

*Pettit v. Procter & Gamble Co.*,
15-CV-02150-RS, 2017 WL 3310692 (N.D. Cal. Aug. 3, 2017)....................17

*Poulos v. Caesars World, Inc.*,
379 F.3d 654 (9th Cir. 2004) ....................30

**TABLE OF AUTHORITIES**
**(cont'd)**

**Page**

*State Farm Mut. Auto. Ins. Co. v. Kugler*,
No. 11-80051, 2011 WL 4389915 (S.D. Fla. Sept. 21, 2011)..........................35

*Stearns v. Ticketmaster Corp.*,
655 F.3d 1013 (9th Cir. 2011) ......................................................................16

*Steele v. Hosp. Corp. of Am.*,
36 F.3d 69 (9th Cir. 1994) ............................................................................35

*Stockwell v. City & Cnty. of San Francisco*,
749 F.3d 1107 (9th Cir. 2014) ..................................................................31, 32

*Townsend v. Monster Bev. Corp.*,
303 F. Supp. 3d 1010 (C.D. Cal. 2018) ..........................................................18

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 422 (2016)........................................................................................26

*United States v. Lothian*,
976 F.2d 1257 (9th Cir. 1992) ......................................................................23

*United States v. Philip Morris USA*,
316 F. Supp. 2d 19 (D.D.C. 2004)..................................................................23

*United States v. Rone*,
598 F.2d 564 (9th Cir. 1979) ........................................................................36

*United States v. Umagat*,
998 F.2d 770 (9th Cir. 1993) ........................................................................23

*Varney v. R.J. Reynolds Tobacco Co.*,
118 F. Supp. 2d 63 (D. Mass. 2000)..........................................................35, 36

# TABLE OF AUTHORITIES
# (cont'd)

**Page**

## STATUTES

18 U.S.C. § 1343 ........................................ 2

18 U.S.C. § 1961(4) ........................................ 36

18 U.S.C. § 1962 ........................................ 2, 23

Cal. Bus. & Prof. Code § 17200 ........................................ 2

Cal. Bus. & Prof. Code § 17500 ........................................ 2

Cal. Civ. Code § 1750 ........................................ 2

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiffs are individual consumers with no corporate affiliations.

## INTRODUCTION

Defendants' petitions should be denied because they do not meet any criteria this Court has identified as grounds for granting interlocutory appeal: when a class certification order (1) rings a "death knell" for the litigation, (2) raises "an unsettled and fundamental issue" of law related to class actions that is likely to evade end-of-the-case review, or (3) is "manifestly erroneous." *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 957 (9th Cir. 2005). Consequently, Rule 23(f) petitions are granted only "sparingly." *Id*. at 959. Defendants do not meet any of these criteria.

Instead, the petitions seek to manufacture bases for appeal by misconstruing the facts and the law. Though Defendants took the same approach below, the district court certified the proposed classes after carefully analyzing Plaintiffs' theories of liability, the legal standards governing the claims, and the relevant facts. While Defendants disagree with the district court's determinations, they have not shown that the class certification order should be addressed in an interlocutory appeal under Rule 23(f).

## BACKGROUND

In a comprehensive order, the district court certified four classes of purchasers who were overcharged for JUUL products or seek a refund of their purchase price as a result of JUUL's youth-focused marketing:

- A nationwide class of JUUL purchasers;
- A California class of JUUL purchasers;
- A nationwide class of JUUL purchasers aged under 18;
- A California class of JUUL purchasers aged under 18.

(Order on Motion for Class Certification and Related Daubert Motion ("Order"), Dkt. No. 3327, at 2-3, 93.) The classes are limited to individuals who purchased JUUL from brick-and-mortar or online retailers—i.e., not from re-sellers. (*Id.*)

## I. Summary of Claims

The nationwide classes bring RICO claims against several Altria entities (collectively, "Altria"); JUUL founders Adam Bowen and James Monsees; and the three directors who managed JUUL through its largest growth period—Nicholas Pritzker, Riaz Valani, and Hoyoung Huh ("Other Director Defendants" or "ODDs"). (*Id.* at 1-2.) Plaintiffs allege that these RICO Defendants operated JUUL as a fraudulent enterprise, using the mail or wires, in violation of 18 U.S.C. §§ 1962 and 1343. (*Id.* at 5, 26, 30-31.)

The California classes allege that Juul Labs, Inc. ("JLI") violated the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 ("UCL"); the California Legal Remedies Act, Cal. Civ. Code § 1750 ("CLRA"); the California False Adverting Law, Cal. Bus. & Prof. Code § 17500 ("FAL"); and engaged in

common-law fraud. (*Id.* at 2-3.)[1] The California classes further allege unjust enrichment, and violation of the implied warranty of merchantability (*id.* at 2), but these claims are not addressed in the petitions.

Plaintiffs' fraud-based claims allege that JUUL—as operated by its founders, directors, and Altria—deceived consumers with misrepresentations and omissions through marketing and labeling. Fundamentally, these deceptions fall into two categories: (1) whether JUUL was safe for consumers; and (2) the extent to which it was an addictive product. (*Id.* at 8.) Defendants' deception allowed them to charge a premium price for JUUL, thereby harming everyone who purchased the product. (*Id.*)

Importantly, Plaintiffs are not claiming personal injury damages. Their damages are entirely *economic*: Defendants' fraudulent misrepresentations and omissions about JUUL resulted in the product being sold at a higher market price (*i.e.*, a price premium) paid by all JUUL purchasers. (*Id.* at 8, 21, 27-32.) Any given class member's idiosyncratic reasons for purchasing JUUL is irrelevant; causation and damages turn solely on whether Defendants' deception resulted in the class paying more for JUUL and, if so, to what extent.

---

[1] Some of Plaintiffs' California-law claims are also brought against the ODDs, but the ODDs did not address those claims in their petition.

For the youth classes, Plaintiffs contend that Defendants' deliberately youth-appealing marketing created and supplied an illicit youth market, even though it is illegal for children under 18 years old to purchase nicotine products. (*Id.* at 9.) Consequently, all youth Plaintiffs are entitled to a full refund. (*Id.* at 27-28.) No Defendant addresses the certification of the youth classes in its petition.

## II. Experts' Analyses

Plaintiffs put forth five experts to support their motion for class certification. The district court denied *Daubert* challenges to each expert. (*Id.* at 65-93.)

**Dr. John Chandler:** Dr. Chandler is a clinical marketing professor at the University of Montana and a former research director at Microsoft Advertising. (Order at 69.) Dr. Chandler analyzed the "reach" of JUUL marketing to determine the extent of class exposure to it. He concluded that JUUL's sophisticated marketing reached all, or nearly all, JUUL purchasers in the United States. (*Id.*) Dr. Chandler developed those opinions through analyzing JLI's internal documents and applying his expertise. (*Id.* at 70.)

**Dr. Anthony Pratkanis:** Dr. Pratkanis is an emeritus professor of psychology at the University of California-Santa Cruz who specializes in social influence. (*Id.* at 71.) Applying a scientific, social influence analysis, Dr. Pratkanis explains how Defendants sent a consistent message through all JUUL marketing campaigns: that JUUL is a "tech lifestyle product that satisfies," which "does not

have health, safety, or addictiveness concerns, unlike a tobacco product." (*Id.* at 71-72.) For instance, early campaigns such as "Vaporized" used bright colors and young, attractive models, while the later "Make the Switch" campaign used older models and encouraged switching from combustible cigarettes. But both sent the same lifestyle and safety message. (*See id.* at 44-45 & n.37.) Defendants enhanced the safety message by omitting information about JUUL's risks in marketing and labeling. (*Id.* at 34.).

**Dr. Alan Shihadeh:** Dr. Shihadeh is an engineer who specializes in tobacco products. (Order at 67.) He opines about the "abuse liability" of JUUL—i.e., the risk of addiction that it poses. (*Id.*) Dr. Shihadeh explains how he can evaluate the factors that increase JUUL's propensity for addiction—including JUUL's design, operation, and nicotine content—in a manner that is common to all class members. (*Id.* at 67-68.) Defendants' corresponding expert agreed that abuse liability can be evaluated on an "aggregate basis." (*Id.* at 21 n.14.) Thus, Dr. Shihadeh can support, on a class-wide basis, Plaintiffs' argument that "JUUL products used a unique formulation and design that was highly effective at creating and maintaining addiction"—a fact that was not disclosed to consumers. (*Id.* at 17-18.)

**Dr. Sherry Emery:** Dr. Emery is a senior fellow in the Public Health Group and director of the Social Data Collaboratory at the University of Chicago. (Order at 74-75.) She explains how Defendants marketed JUUL through "viral" social

media and designed the product in a way that targeted youth. Defendants also promoted JUUL using techniques similar to the tactics used to promote cigarettes before those tactics were outlawed. (*Id.* at 75.) These tactics are particularly potent on social media where algorithms multiply the impact of posts. (*Id.*) Defendants' social media efforts "seeded" additional JUUL content by third parties, which was their goal. (*Id.* at 77-78 & n.54.)

**Dr. Hal Singer:** Dr. Hal Singer ties those opinions together and explains the class damages with his economic analysis. Dr. Singer is a senior fellow at the George Washington Institute of Public Policy and adjunct professor teaching advanced pricing to MBA candidates at Georgetown University. (*Id.* at 78.)

Dr. Singer used a "choice-based conjoint analysis" to determine the impact of Defendants' fraud on the price of JUUL. (*Id.* at 79.) He presented consumers with two types of information that Plaintiffs allege was not disclosed to them or was contrary to the misleading messaging contained in JUUL marketing and labeling. (*Id.*) Dr. Singer questioned respondents about how information concerning the addictiveness and potential health consequences of JUUL would affect what they were willing to play. (*Id.*) Using those surveys, Dr. Singer determined that the market price for JUUL would have been lower if consumers had been provided with complete and accurate information about the products' risks. (*Id.* at 79-80.)

## III. Defendants' Roles

All Defendants contributed substantially to the harms these experts describe, though all marketing, labeling, and sales activity occurred through JLI—the manufacturer and seller of JUUL. (*See* Order at 2.)

Plaintiffs allege that the five individual Defendants—founders Bowen and Monsees, and ODDs Valani, Pritzker, and Huh—controlled JLI and ran it as an unlawful enterprise, and Altria then joined the enterprise in 2017. *In re JUUL Labs, Inc. Mktg., Sales Prac., & Prod. Liab. Litig.*, 533 F. Supp. 3d 858, 862-63 (N.D. Cal. 2021) ("*JUUL II*").

Pritzker and Valani were Board members in January 2015, when JLI devised its marketing plan to win over the "cool kids." *Id.* at 864. The ODDs gained control of JUUL in 2015 and maintained control through at least 2017. *Id.* JUUL marketing's massive youth appeal was a regular topic at board meetings, but JUUL did not change its strategy. *Id.* at 865. After Monsees stepped down as CEO in October 2015, the ODDs took full control of JUUL. *Id.* The ODDs used their power to push forward on JLI's youth-oriented marketing. *Id.*

Altria began coordinating with JLI's leadership in the spring of 2017. *Id.* at 866. Altria shared information with Pritzker and Valani, and began setting aside valuable shelf space near Marlboro cigarettes for JUUL products. *Id.* In 2017, Altria strategized with JLI about the growing concern over flavored products. *Id.*

Altria's lobbying was instrumental in the FDA's 2018 decision to continue letting JLI market mint-flavored JUUL, JLI's biggest seller in 2019. *Id.* Altria then purchased a 35% share of JLI in December 2018, and soon after installed one of its executives as CEO of JLI in 2019. *In re JUUL Labs, Inc. Mktg., Sales Prac., & Prod. Liab. Litig.*, 497 F. Supp. 3d 552, 650 n.78 (N.D. Cal. 2020) ("*JUUL I*"). Altria also mass distributed JUUL—with its deceptive labeling—and developed the "Make the Switch" JUUL marketing campaign. This campaign sought to stave off regulators by presenting JUUL as a smoking cessation device, even though JUUL was never designed to break addiction. *JUUL II*, 533 F. Supp. 3d at 866.

## ARGUMENT

### I. Plaintiffs' California Law Fraud Claims: The District Court's Decisions Concerning Class Exposure and Materiality Were Grounded in Applicable Law and Relevant Facts.

While JLI contends that the district court should have reached different conclusions as to class exposure and materiality, its complaints do not warrant Rule 23(f) review. JLI does not point to any unsettled law concerning these issues. Nor was the district court's decision manifestly erroneous. JLI complains that the district court relied on "artificial constructs," JLI Pet. at 11, but those "constructs" are the legal standards governing Plaintiffs' claims that, under California law, are objective and "ideal for class certification." *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1115 (N.D. Cal. 2018) (Koh, J.) (citation omitted). The district

court certified the classes by applying those legal standards to the relevant facts. JLI provides no basis for concluding that the district court's ninety-four page opinion resulted in manifestly erroneous determinations as to class exposure and materiality.

### A. The District Court Did Not Refuse to Address Relevant Factual Disputes.

JLI repeatedly mischaracterizes the district court's opinion in service of its assertion that the court "decline[ed] to resolve factual disputes over whether plaintiffs could establish the elements of their claims on a class-wide basis using common proof." JLI Pet. at 12. JLI attacks the court's alleged unwillingness to resolve "expert disputes" regarding whether there was a consistent deceptive advertising message, simply because the court noted that the jury would ultimately decide these issues. *Id.*[2] Even as to this limited issue, the district court conducted a thorough review of the evidence—including the conflicting expert reports—and resolved all factual issues necessary to certify the class. Deferring to the trier of fact as to the merits of Plaintiffs' claims is perfectly in keeping with that standard.

This Court recently addressed the extent to which a district court must resolve factual disputes at class certification in *Olean Wholesale Grocery Coop.*,

---

[2] Notably, this argument only concerns Plaintiffs' advertising misrepresentations claims; it has nothing to do with omissions or labeling claims.

*Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) (en banc). As the Court explained, "'Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.'" *Id.* at 667 (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013)). Instead, although a district court must resolve factual disputes to determine "whether the 'common question' prerequisite is met," even where it "overlap[s] with the merits," the "district court is limited to resolving whether the evidence establishes that a common question is *capable* of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial." *Id.* (emphasis in original).

The district court discharged its duties in accordance with this standard. JLI claims that the district court did not make findings as to whether there was a consistent deceptive advertising message. JLI Pet. at 13-14.[3] But the court reviewed all evidence and expert testimony and held that the issue was capable of resolution on a classwide basis. Specifically, the court concluded that "Plaintiffs have shown ... for purposes of this motion" that (1) "JLI employed a consistent message/USP in its marketing" and (2) "that some significant portion of class

---

[3] JLI also contends that the district court failed to make findings concerning whether the deceptive advertising was material to class members and whether that message reached a sufficient number of class members through viral social media efforts. Those arguments—and the district court's analysis of the relevant facts—are addressed in the following two sections.

members actually saw and relied on representations and messages conveyed in JLI's marketing and labelling." (Order at 38.) Applying these factual determinations, the district court held that "[a]t this juncture, plaintiffs have plausibly shown that 'a critical mass of consumers' were likely misled by defendants' conduct" (*Id.* at 35.)

The district court's order is replete with findings that Plaintiffs have shown that these issues are capable of classwide resolution:

- "[P]laintiffs have shown through their experts how JLI used a USP consistently through its marketing materials, how it disclosed and failed to disclose information regarding nicotine content and addictiveness on its labelling and other marketing materials, and how those actions led to the exponential growth and use of JUUL products by class members." (*Id.* at 34.)

- Plaintiffs have "made a showing (disputed by defendants) through Dr. Anthony Pratkanis that JLI's marketing strategy created a USP that remained consistent and carried through the various marketing and advertising campaigns JLI undertook during the class period." (*Id.* at 18.)

- "Here, there is classwide proof showing the 'message' or USP of JUUL was received by a significant portion of the class members—Californians who purchased JUUL products from brick and mortar or online retailers." (*Id.* at 45.)

- "[P]laintiffs have shown the pervasiveness of JLI's successful marketing strategy and the consistency of the message or USP of JUUL to support a presumption of reliance for absent class members on JLI's marketing materials." (*Id.* at 51.)

The district court did not simply rest "its certification decision on the mere fact Plaintiffs found an expert who asserts that plaintiffs' claims" can be proven classwide, as JLI contends. JLI Pet. at 14. Instead, the district court resolved expert

disputes to the extent necessary to determine that these issues were capable of classwide resolution. For example, JLI asserts that the court ignored JLI's expert's testimony that "the significant variation in JLI's advertising messages, frequency, duration, location, and channels over time should have precluded any finding of class-wide exposure." JLI Pet. at 15. In fact, the court considered JLI's expert testimony in this regard, (Order at 45-47), but found that just because "the 'look of particular advertisements varied, that different text was used, or that different channels delivered the messages, does not necessarily undermine plaintiffs' experts opinions that the themes and USP were consistent across the relevant time periods." (*Id.* at 47.)[4]

JLI claims that the district court "punted to the jury" on these issues simply because the court observed that these issues were "disputed," that JLI may contest these issues at trial, and that they will be resolved by the "trier of fact." JLI Pet. at 13. As this Court recently explained, a district court's "findings at the certification stage 'do not bind the fact-finder on the merits.'" *Olean*, 31 F.4th at 668 n.10 (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 318 (3d Cir.

[4] The same is true for other issues about which Defendants complain: the district court examined the reports and testimony of each side's competing experts, and found that Plaintiffs had nevertheless established that each issue was capable of resolution on a classwide basis. *See, e.g.*, Order at 43-45 (reach, exposure, virality); 54-55 (materiality).

2008)). Instead, "'the court's determination for class certification purposes may be revised (or wholly rejected) by the ultimate factfinder.'" *In re Hydrogen Peroxide*, 552 F.3d at 318 n.19 (citation and alteration omitted). In other words, although the district court concluded—for purposes of class certification—that Plaintiffs had shown a consistent marketing message across all advertisements such that the issue of deception was capable of resolution classwide (*see, e.g.*, Order at 38), the jury may weigh the competing expert testimony differently. The district court's observation that certain factual issues would ultimately be determined by the jury in no way suggests the court did not make the necessary findings to certify the class.

Ultimately, JLI is arguing that the district court erred by not concluding that Plaintiffs' evidence was sufficient to win at trial, but that is not the standard. The district court correctly examined the voluminous record in this case, weighed competing evidence, resolved disputes as necessary, and concluded that Plaintiffs had established that each issue was *capable of resolution on a class wide basis*. That is all the district court was required to do. *Olean*, 31 F.4th at 667.

### B. Certification Did Not Depend on Exposure to Third-Party Social Media Content.

JLI distorts the record when it complains that the district court found classwide exposure based on class members' exposure to third-party social media content that JLI did not create.

As an initial matter, JLI's exposure arguments are irrelevant to Plaintiffs' labeling theories; all class members (JUUL purchasers) were exposed to the product labels. Regarding Plaintiffs' marketing theories, the district court relied on Dr. John Chandler's opinion that "JUUL marketing reached all or nearly all purchasers of a JUUL product in the United States." Chandler Rpt., ECF 1772-21 at 115[5]; (*see also* Order at 45 (citing Chandler)). Dr. Chandler's opinion is based on marketing activities conducted by JLI or at JLI's direction, not third-party social media content. *See* Chandler Rpt., ECF 1772-21 at 112-13 (detailing the advertising underlying Chandler's reach opinions, which included only JUUL-sponsored social media activity); Chandler Dep., ECF 2310-2, at 55:2-12, 155:10-15 (stating that social media exposure via third parties "further bolster the opinions" about reach). Defendants offered no opposing marketing expert and presented "no contrary evidence to undermine the bulk of Chandler's reach estimates, based either on JLI's own documents or on Chandler's separate calculations." (Order at 70.) Thus, neither the Plaintiffs nor the district court relied on third-party social media content to establish classwide exposure to JUUL marketing, and JLI is simply wrong to assert that Plaintiffs' claims are based on exposure "through social media." JLI Pet. at 8. And in addressing *Mazza v. Am.*

---

[5] "ECF" citations refer to filing in the district court docket.

*Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012), on which JLI relies, the district court concluded that "the extent and reach of JLI's marketing campaigns regarding the central characteristics of the product was significantly deeper than the marketing regarding the one aspect of the braking system in *Mazza*." (*Id* at 49.)

That said, JLI is responsible for the third-party content at issue. The district court did not impute the actions of third parties to JLI because of a legal relationship—such as agency—between them. (*See* Order at 78 n.54 (distinguishing agency theory from Plaintiffs' allegations)). Instead, JLI's "own actions and content intended and caused the subsequent content," and therefore JLI caused class exposure to vast amounts of JUUL third-party content. (*Id.* at 78; *see also id.* at 44 n.36 (citing Plaintiffs' expert opinion that "a main purpose of corporate use of social media to introduce and market a product is to spur third-party content to create the viral response JUUL allegedly achieved"). The district court found Plaintiffs' evidence on this sufficient and denied Defendants' related *Daubert* challenges. (*Id.*)

### C. Uniform Materiality Among Class Members Is Not Required Under California Law.

JLI faults the district court for "assum[ing]" that the misrepresentations and omissions at issue "would be equally material" to different types of purchasers. JLI Pet. at 8. But the district court made no such assumption. And, contrary to JLI's petition, the district court correctly recognized that the "reasonable person"

standard under California law does not require the misinformation to be equally material to all class members. (Order at 53.)

JLI repeatedly cites the Ninth Circuit's decision in *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022-23 (9th Cir. 2011), claiming that misrepresentations and omissions under "California law" must be "material to all class members." *E.g.* JLI Pet. at 11. But JLI fails to mention that *Stearns* related only to CLRA claims, and that a "CLRA claim warrants an analysis different from a UCL claim ... ." *Stearns*, 655 F.3d at 1022. JLI's argument, thus, has no bearing on Plaintiffs' non-CLRA fraud claims. *Stearns* also recognized that the "reasonable person" standard applies to CLRA claims. *Id*. And post-*Stearns* cases from California appellate courts have done the same. *See Gutierrez v. Carmax Auto Superstores California*, 19 Cal. App. 5th 1234, 1258 (Cal. Ct. App. 2018) ("In the context of the CLRA, a fact is 'material' if a reasonable consumer would deem it important.").

Additionally, nothing in *Stearns* or any other case supports JLI's contention that a misrepresentation or omission must be "equally material" to class members, a standard that would be at odds with the decades-old reasonable consumer standard under California law. (*See* Order at 53 ("Plaintiffs do not have the 'burden to establish that there is a uniform understanding among putative class members as to the meaning of [the information at issue], or that all or nearly all of them shared any specific belief.'") (quoting *Pettit v. Procter & Gamble Co.*, 15-CV-02150-RS,

2017 WL 3310692, at *3 (N.D. Cal. Aug. 3, 2017) (relying on *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016)).

Even if purported differences among class members' backgrounds (*see* JLI Pet. at 22-23) could be relevant to the "reasonable consumer" materiality inquiry in this case, the district court found that JLI did not make such a showing here. The district court recognized that "it is undisputed that there are differences among the proposed class representatives," cited the Defendants' appendix that purported to demonstrate those differences, and explained in detail the testimony and claims of each proposed class representative. (Order at 6-11.) The court concluded that the differences identified by Defendants were not "*material* to the claims at issue and the legal theories underpinning" Plaintiffs' claims. (*Id.* at 7 (emphasis in original).) The court continued:

> Defendants provide no evidence or argument how the fact that some purchasers knew JUUL had nicotine and some did not undermines the materiality of the alleged misstatements and omissions. Nor do they explain how the misrepresented or undisclosed information was immaterial for a significant portion of the class simply because some purchasers were new to nicotine and others were cigarette smokers.

(*Id*. at 55.) Plaintiffs, moreover, provided an Appendix of discovery responses in which they "identif[ied] why the misrepresented and omitted information would have been material to them." *Id*. at 54 (citing Pls. Appendix B, ECF 2439-6). The district court also concluded that "Plaintiffs' experts—primarily Emery and

Pratkanis—likewise provide a basis for classwide proof of materiality under the reasonable consumer standard." (*Id*. at 54.) Even if Defendants had shown that the purchasing decision of a reasonable person (or category of persons) may also have been influenced by other factors, Plaintiffs were not required to prove that the challenged health statements were the "sole or even the predominant or decisive factor." *In re Tobacco II Cases*, 46 Cal. 4th 298, 326 (2009).

Lastly, the cases JLI cites do not hold that materiality must be demonstrated equally for every class member, and those cases, like the district court here, acknowledge the reasonable consumer standard. *E.g.*, *Townsend v. Monster Bev. Corp.*, 303 F. Supp. 3d 1010, 1048 (C.D. Cal. 2018) (focusing on the "question of whether a reasonable consumer would consider any of the challenged statements a material misrepresentation"). The two out-of-circuit cases JLI cites did not address claims under California law and are thus irrelevant. *See McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 225 (2d Cir. 2008); *In re Light Cigarettes Mktg. Sales Pracs. Litig.*, 271 F.R.D. 402 (D. Me. 2010). As the court found, these cases are also distinguishable on their facts, including marked differences in the plaintiffs' legal theories. (*See* Order at 19-20.)

## II. Plaintiffs' RICO Claims: Defendants' Arguments Are Meritless and Not Relevant to Class Certification Issues.

### A. There Are No *Comcast* Issues Warranting Interlocutory Review.

#### *1. Plaintiffs' Damages Models Are Consistent With* Comcast.

In *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), the Supreme Court held that, for Rule 23(b)(3) certification of a damages class, "plaintiffs must present a damages model consistent with their theory of liability; that is, a damages model measuring 'only those damages attributable to that theory.'" (Order at 24 (quoting *Comcast*, 569 U.S. at 35).) This means only that a damages model must be "closely tied to the relevant legal questions." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1168-69 (9th Cir. 2014).

As the district court correctly held, Plaintiffs' damages models satisfy *Comcast* because they are "closely-enough tethered to plaintiffs' theories of liability" and "can be adjusted (if necessary and as necessary) for the merits stage." (Order at 27.) Plaintiffs' liability theory is that Altria and the ODDs (the "RICO Defendants") operated JLI as a RICO enterprise, engaging in multiple schemes to defraud, including the "fraudulent scheme to deceive JUUL purchasers regarding the potency, addictiveness, and safety of JUUL products." (Order at 4); *see also*

*JUUL II*, 533 F. Supp. 3d at 862-63 (denying motion to dismiss and detailing the RICO schemes alleged).[6]

Plaintiffs' damages models measure damages flowing from those theories of liability. Their damages expert, Dr. Singer, conducted choice-based conjoint analyses to estimate the price premiums the marketplace assigned to JUUL products due to information misrepresented and omitted from the labeling and marketing.[7] Dr. Singer conducted two surveys, one measuring the effect of the withheld information about addiction risk, and one measuring the effect of the withheld information about safety risk. (Order at 79-80.) The result is two price premiums (one for each bucket of misinformation) that each purchaser paid due to the misrepresentations and omissions distorting the market.[8]

---

[6] The petitions do not raise a *Comcast* issue as to Plaintiffs' full refund model applicable to their youth marketing claims, and for good reason: the refund calculation tracks the legal theory that these were illegal transactions.

[7] Despite ODDs' citation to a single out-of-Circuit case, conjoint analysis is a widely accepted economic method to study and quantify consumer preferences. *See, e.g.*, *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 373 (N.D. Cal. 2018) (Koh, J.) ("[C]onjoint analysis is a generally reliable, well recognized method for estimating how consumers value different attributes of a product.").

[8] That Dr. Singer tested addiction messages on labels does not implicate federal preemption under the Tobacco Control Act. (Order at 17 n.12); *see also In re JUUL Labs, Inc. Mktg., Sales Prac., & Prod. Liab. Litig.*, 497 F. Supp. 3d 552, 585-94 (N.D. Cal. 2020) (analyzing preemption framework in detail). And as Dr. Singer explained, his survey design is indifferent as to *where* the information

In *Comcast*, the problem was that plaintiffs' damages model assumed the class would succeed in proving four theories of antitrust liability, but the district court certified for class-wide determination only one of the four theories. *Comcast*, 569 U.S. at 31. There was no evident way for the model to "scale down" to reflect the narrowed liability case. *Id.* ("As Dr. McClave acknowledged … the model did not isolate damages resulting from any one theory of antitrust impact."). There is no such mismatch in this case. Plaintiffs seek to certify, and Dr. Singer measured harm from, the same theories of liability.

### ***2. Altria's Liability Defenses Do Not Present Individual Questions or Implicate Comcast.***

Altria contends that it is not liable to the class, or that its liability should be limited. Altria Pet. at 10-16. But the question at class certification is not whether Altria is liable or for what amount. It is whether Plaintiffs' damages models are sufficiently connected to the theories of liability that they show that "damages are susceptible of measurement across the entire class." *Comcast*, 569 U.S. at 35. They are.

Altria's arguments present common questions, the potential answers to which are accommodated by Plaintiffs' damages models. First, Altria asserts it is

---

about addictiveness is provided (e.g., labels or advertising), as long as it is available to the purchaser prior to the purchasing decision. Singer Reply Rpt., ECF 2439 at 21-22 & nn. 29 & 30.

not liable for the enterprise's fraudulent marketing or youth promotion *at all*. Altria Pet. at 11. If so, then Plaintiffs' damages models, which measure the injury caused by those schemes, would assign no liability to Altria. Second, Altria asserts that its liability starts only at a certain date. *Id.* But the "solution to this issue," *id.* at 15, if Altria is correct is simple: Altria is not responsible for damages in connection with purchases before that date. This is not a *Comcast* problem: Dr. Singer explained that his model allows for the estimation of damages over any "combination of states, time periods, or products." Singer Rpt., Doc. ECF 1772-19, ¶ 43.

Altria also misapprehends the nature of RICO conspiracy liability under § 1962(d). All defendants who participated in the RICO conspiracy are liable for the entire injury caused by the enterprise's illegal conduct, regardless of whether they personally participated in every aspect of the conspiracy. (*See, e.g.*, Order at 30 ("The five schemes identified by plaintiffs, interrelated and *together*, establish the overall pattern of racketeering alleged.")); *Oki Semiconductor Co. v. Wells Fargo Bank, N.A.*, 298 F.3d 768, 775 (9th Cir. 2002) ("[T]he damage wrought by the conspiracy is not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.") (internal quotation marks omitted).[9]

---

[9] Altria suggests that *Oki*'s discussion of the scope of RICO conspiracy liability was *dicta* and should be disregarded. Altria Pet. at 15 n.2. *Oki* iterated a

The conspiracy includes acts undertaken before Altria joined it. *See United States v. Umagat*, 998 F.2d 770, 772-73 (9th Cir. 1993) ("One may join a conspiracy already formed and in existence, and be bound by all that has gone before in the conspiracy, even if unknown to him." (citation omitted)); *Indus. Bldg. Mats., Inc. v. Interchemical Corp.*, 437 F.2d 1336, 1343 (9th Cir. 1970) ("One who enters a conspiracy late, with knowledge of what has gone before, and with the intent to pursue the same objective, may be charged with preceding acts in furtherance of the conspiracy.").[10]

Regardless of whether these arguments are evaluated under Plaintiffs' direct § 1962(c) claims or § 1962(d) conspiracy claims, these are merits issues, not Rule 23 issues, and do not establish a "mismatch" between Plaintiffs' liability and damages theories.

---

widespread and commonsense consensus as to the scope of RICO conspiracy liability. *See United States v. Philip Morris USA*, 316 F. Supp. 2d 19, 27 & n.8 (D.D.C. 2004) ("Every circuit in the country that has addressed the issue has concluded that the nature of both civil and criminal RICO offenses requires imposition of joint and several liability because all defendants participate in the enterprise responsible for the RICO violations." (collecting cases, including *Oki*)).

[10]Altria cites *United States v. Lothian*, 976 F.2d 1257 (9th Cir. 1992), but *Lothian* concerned whether a co-conspirator could be criminally liable for overt acts committed after he *withdrew* from the conspiracy. *Id.* at 1261.

### 3. *The ODDs' Damages Arguments Do Not Raise* **Comcast** *Concerns, and Are Meritless In Any Event.*

As with Altria, none of the ODDs' attacks on Dr. Singer's models implicate *Comcast* (or any other Rule 23 issue). First, the ODDs argue that Dr. Singer's damages model is "insensitive" to label and advertising changes over time. Plaintiffs' theory is that the class was exposed to consistent messaging about JUUL products, not that they were exposed to the exact same labels and ads. (Order at 17-18); *see also In re Hyundai and Kia Fuel Economy Litig.*, 926 F.3d 539, 560 (9th Cir. 2019) (en banc) ("When misrepresentations are made as part of a nationwide, concerted marketing effort, it makes no difference to the predominance analysis whether consumers encounter them in different guises."); *In re First Alliance Mortg. Co.*, 471 F.3d 977, 991 (9th Cir. 2006) ("The exact wording of the … misrepresentations … is not the predominant issue. It is the underlying scheme which demands attention." (citation omitted)). It does not matter that the image and style of advertisements varied. ODD Pet. at 19-20. Dr. Singer's models focuses on the massaging class members were exposed to (or not in the case of omissions), as *Comcast* requires. Defendants may put on evidence at summary judgment or trial that class-wide damages should start or stop on certain dates, but they have not

identified a disconnect between Plaintiffs' liability theory and their damages models.[11]

Next, the ODDs argue that the district court misunderstood Plaintiffs' liability theory and failed to measure Dr. Singer's analysis against it. ODD Pet. at 22. Not so. Plaintiffs' class-wide liability theory is exactly as the district court described it: addiction- and safety-related misrepresentations and omissions. (Order at 17.) The district court confirmed that those theories were "at the heart of the claims" and "adequately encompassed by the allegations in [the operative complaint]." (*Id.* at 26.) *Comcast* gives the ODDs no license to decide what Plaintiffs' liability theory should be. *See, e.g.*, *In re Suboxone (Buprenorphine Hydrochlorine and Naloxone) Antitrust Litig.*, 967 F.3d 264, 270 (3d Cir. 2020) (rejecting *Comcast*-based argument where the defendant argued that the relevant "theory of liability" was different than the plaintiffs' "theory of their case").

Finally, the ODDs say that Dr. Singer should have used different wording in his surveys. ODD Pet. at 22-23. This is not a class certification issue. The goal of

---

[11] The ODDs complain about Dr. Singer's calculation of a single price premium over the class period. But damages "[c]alculations need not be exact." *Comcast*, 569 U.S. at 35; *see also, e.g.*, *BCS Servs., Inc. v. Heartwood 88, LLC*, 687 F.3d 750, 759 (7th Cir. 2011) ("Once the plaintiff proves injury, broad latitude is allowed in quantifying damages …."). The ODDs may try to prove that damages should be lower for any given stretch of time.

expert damages testimony at class certification is to provide a scientifically valid, reliable method for calculating damages on a classwide basis, using data and methods common to all class members. *See Comcast*, 569 U.S. at 38 (calculations "need not be exact" so long as they "attempt" to measure damages flowing from the common liability theory). The ODDs' criticism of Dr. Singer's surveys go to the merits, not to class certification. *See Olean*, 31 F.4th at 667-68 (explaining that the Supreme Court has held that evidence can be common and support class certification "even though a jury could still decide that the evidence was not persuasive"); *see also Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 422, 457 (2016) (explaining that the question of whether the expert's "study was unrepresentative or inaccurate" was "itself common to the claims made by all class members"). And even at the merits stage, criticisms of survey "methodology" and "design" "go to the weight of the survey rather than its admissibility." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Management, Inc.*, 618 F.3d 1025, 1038 (9th Cir. 2010).[12]

---

[12] Although unnecessary to resolve at this stage, the ODDs (at pages 18 and 22-23) are wrong about Dr. Singer's surveys. First, the "nicotine content" statement on JUUL packaging and advertising is deceptive *because* it has the tendency to mislead consumers about the extent to which JUUL is designed to foster and maintain addiction. Second, the ODDs misquote Plaintiffs' addiction expert, omitting that Defendants asked him to testify outside his area of expertise, that he

The ODDs complain about the district court's statement that the language used in Dr. Singer's surveys could be adjusted at the merits stage so long as the overall methodology remained the same. ODD Pet. at 23-24. But at the class certification stage the district court was right to consider aspects of Dr. Singer's analysis "only to the extent … they are relevant to … the Rule 23 prerequisites." (Order at 4 (quoting *Amgen*, 568 U.S. at 465-66)). The precise wording about addiction or safety risk does not implicate whether Rule 23's requirements are satisfied. For example, the ODDs assert that Dr. Singer should have used different words to test consumer reaction to disclosing the risk of physical injuries associated with using JUUL. ODD Pet. at 22-23. Adjustments to the wording at the merits stage, *i.e.* modifying the description of the risks posed by JUUL, would not change the fact that his methodology is common to the class.[13]

---

could not evaluate in the abstract the use of quantitative addiction statements, and that Defendants' questions asked about a "numerical scale for addictiveness," which is not what Dr. Singer used. (*See* Order at 15-16 (noting Defendants' habit of mischaracterizing expert deposition testimony).) Defendants' own expert agreed that "general statements can be made regarding a product's potential for abuse, based on factors alleged to be critical in this case—design features and method of delivery." (*Id.* at 21 n.14.) Finally, the physical risks Dr. Singer tests—pulmonary, cardiovascular, and neurological—match those pleaded in the complaint. Second Am. Class Compl., ECF 1134-3 at ¶¶ 664-699.

[13] The physical risks that Dr. Singer tested at the class certification stage—pulmonary, cardiovascular, and neurological—match those pleaded in the complaint. Second Am. Class Compl., ECF 1134-3 at ¶¶ 664-99.

### B. Defendants' Causation Arguments Do Not Raise Class Certification Issues.

In addition to their *Comcast*-focused arguments, the RICO Defendants raise additional RICO-based arguments, mostly focused on causation. None raise a basis for Rule 23(f) review. The district court did not err, manifestly or otherwise. The court properly applied *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008), and other precedents to the facts. And even if the court had misapplied *Bridge*, the result would be the same across the class.

#### *1. The District Court Properly Applied Bridge in Determining that Plaintiffs Do Not Have to Prove Individual Reliance.*

The RICO Defendants' arguments focus primarily on proximate causation, attempting to impose an individualized reliance requirement that does not exist. Defendants contend that:

- "RICO claims … turn on 'individualized reliance issues related to plaintiffs' knowledge, motivations, and expectations.'" Altria Pet. at 17.
- "Plaintiffs had to prove they could show common evidence of direct harm, which here requires 'at least third-party reliance' that led directly to *each plaintiff's* injuries." ODD Pet. at 12.

Those arguments are clearly at odds with the Supreme Court in *Bridge* and this Court's post-*Bridge* decisions:

- "[T]he fact that proof of reliance is often used to prove an element of the plaintiff's cause of action, such as the element of causation, does not transform reliance itself into an element of the cause of action." *Bridge*, 553 U.S. at 659.

- "What mattered most in the RICO proximate causation inquiry was whether there was a direct relationship between the alleged RICO violation and the plaintiffs' alleged injury." *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd.*, 943 F.3d 1243, 1259 (9th Cir. 2019).

As *Bridge* made clear, Plaintiffs need not show that every class member relied on a misrepresentation. The critical causation link is from the *fraudulent scheme* to the harm—not from the reactions of individual class members. *Bridge,* 553 U.S. at 649 (holding that "a person can be injured 'by reason of' a pattern of mail fraud even if he has not relied on any misrepresentations"). Thus, if the fraud—and reliance on that fraud—was sufficiently prevalent to cause all purchasers to overpay for a product, then all purchasers would have been damaged.

Plaintiffs have alleged—and have supported with extensive documents and expert testimony—that the RICO Defendants' fraudulent scheme permitted them to charge a price premium that affected all JUUL consumers. (*See* Order at 33-38, 79-80.) Plaintiffs' experts explained how the misrepresentations and omissions impacted the information available to consumers and their perceptions of the product, and Dr. Singer analyzed the impact of that deception in terms of a market wide price premium. (*See id*. at 79-80.) This connection satisfies the proximate causation requirement that there be "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992). Causation in this case is fundamentally the same as in

*Painters*. The *Painters* plaintiff was a union fund that overpaid for prescriptions, based on the defendant hiding information about a drug's safety risk. *Painters*, 943 F.3d at 1246. Although Takeda's misrepresentations and omissions misled prescribers and patients—not the fund—the fund had a valid RICO claim based on overcharges deriving from the defendant's deception. *Id.* at 1259-60. Thus, as with JUUL consumers here, misrepresentations and omissions about the product caused the fund to be overcharged. *Id.*

The RICO Defendants' complaints about the district court's reference to "critical mass" are also meritless. The phrase "critical mass" simply expresses factual reality—*i.e.*, that Defendants' deception had a sufficiently broad impact to alter JUUL's price. (*See* Order at 34.) It is not a "novel theory," but instead a factual conclusion reached after rigorous analysis of competing factual presentations—exactly what the district court was supposed to do.

Finally, the RICO Defendants' reliance on *Poulos v. Caesars World, Inc.*, 379 F.3d 654 (9th Cir. 2004), is misplaced. The case pre-dates *Bridge*, and the plaintiffs' claims were entirely different. The plaintiffs were gamblers who alleged they were personally misled by video poker machines that—unbeknownst to them—had pre-determined outcomes for each play. *Id.* at 659-60. Thus, each claim depended on the player's belief about how the machines operated, precluding class certification. *Id.* at 665-66 (describing the holding as "both narrow and case-

specific”). But Plaintiffs’ claims here do not depend on any individual’s reliance—they depend on proof that the RICO Defendants’ fraudulent scheme misled consumers to such a degree as to permit JUUL to sell at an inflated price. (Order at 33-38.)

#### ***2. All Issues Related to RICO Causation Are Common to Every Plaintiff, So Any Error is Unrelated to Class Certification.***

Another reason to reject Defendants’ petitions is that they raise merits issues on RICO, not class certification issues. Besides the “death knell,” the only bases for granting a Rule 23(f) appeal—raising an unsettled legal issue or fixing a manifest error—apply solely to class certification issues. *See Chamberlan*, 402 F.3d at 959 (an unsettled legal issue must “relat[e] to class actions”); *Stockwell v. City & Cnty. of San Francisco*, 749 F.3d 1107, 1113 (9th Cir. 2014) (“The principle that courts must consider merits issues only as necessary to determine a pertinent Rule 23 factor, and not otherwise, has special force at the appellate level.”).

The Court need not look past Altria’s section heading to see that its focus is misplaced: “This Court should immediately review the district court’s manifestly erroneous *expansion of RICO*.” Altria Pet. at 16 (emphasis added). As explained above, the district court did not “manifestly err” or expand RICO. But even if it did, that action would not be grounds to grant the petition. Because Rule 23(f) is directed to class certification issues, this Court has no jurisdiction to consider

merits issues unless they bear directly on class certification. *See Stockwell*, 749 F.3d at 1113.

Here, the operation of the RICO statute—as to causation or any other issue—does not affect whether common issues predominate. *Amgen* is largely on point. The Court held that common questions predominated because, if the class were unable to prove materiality—a necessary element of Plaintiffs' fraud-on-the-market claim—"the failure of proof … would end the case for one and for all." *Amgen*, 568 U.S. at 468.

The same is true here. Plaintiffs allege that the RICO Defendants engaged in a fraudulent scheme that artificially raised the price of JUUL. (*See* Order at 33-38, 79-80.) If there was no fraudulent scheme or price premium attributable to the fraud, then all Plaintiffs' claims will fail. As in *Amgen*, individual reliance is immaterial. *See Amgen*, 568 U.S. at 467-68. If the price was artificially high, then anyone who paid that price was damaged, regardless of why they purchased JUUL. *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 120 (2d Cir. 2013) (recognizing overpayment as class damages under RICO). Thus, the class claims rise and fall together. *See Amgen*, 568 U.S. at 468 (holding failure of proof on a common question "ends the litigation").

Unable to contradict this point, the ODDs resort to claiming that the law is unfair. *See* ODD Pet. at 16. The claims' merits will be addressed at summary

judgment and trial, which pose an entirely separate question from the relevant inquiry for purposes of Rule 23: whether the claims are sufficiently cohesive to warrant class treatment. *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 594 (1997). Further, as stated in *Bridge*, if a party is unsatisfied with the law, "the correction must lie with Congress." *Bridge*, 553 U.S. at 660 (quotations omitted).

### ***3. Altria's Additional Arguments Lack Merit.***

While Altria and the ODDs focus primarily on their causation/reliance arguments, Altria advances four additional arguments related to RICO, none of which support granting its petition.

#### *(1) Plaintiffs did not voluntarily overpay for JUUL.*

Altria claims that there can be no RICO recovery based on a voluntary action. Altria Pet. at 20-21. But this argument confuses the voluntary action of buying the product with the non-voluntary action of overpaying for the product. The RICO Defendants' scheme caused every Plaintiff to be overcharged, thereby creating "some 'direct relationship' between the injury asserted and the injurious conduct." *Oki*, 298 F.3d at 773 (quoting *Holmes*, 503 U.S. at 269).

Altria's cases are inapposite. For instance, Altria relies on *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173 (3d Cir. 2000), in which the plaintiffs sued a casino that would not let them count cards. *Id.* at 177-78. Having already rejected the claim on its merits, the court noted in *dicta* that the plaintiffs

did not have to play blackjack. *Id.* at 187-88. Clearly, this case presents a different scenario, as there is no involuntary "overcharge" associated with blackjack. Similarly, the plaintiffs in *Cadle Co. v. Flanagan*, No. 3:01CV1909 (AVC), 2005 WL 8167447 (D. Conn. Feb. 11, 2005), paid money that they did not owe to an attorney. *Id.* at *4. Conversely, any Plaintiff who purchased JUUL owed the purchase price.

Finally, even if the voluntary nature of a JUUL purchase precluded RICO damages, that would be a common issue and not a basis to grant a Rule 23(f) petition. *See Chamberlan*, 402 F.3d at 959.

*(2) Altria's pass-on arguments do not raise Rule 23 concerns.*

Altria's argument about re-sellers is equally meritless. Anyone who paid an overcharge for JUUL was damaged, regardless of what happened next. This has always been the law. In the context of federal antitrust law, for example, the Supreme Court found that a plaintiff could show damage to business or property even if it passed on an overcharge. *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 487–89 (1968). Other federal courts have reached this conclusion in the RICO context, where the plaintiff passed on an overcharge. *See, e.g.*, *Cnty. of Oakland v. City of Detroit*, 866 F.2d 839, 846-47 (6th Cir. 1989); *State Farm Mut. Auto. Ins. Co. v. Kugler*, No. 11-80051, 2011 WL 4389915, at *10

(S.D. Fla. Sept. 21, 2011). The district court's decision, thus, did not contradict established law or create a split in authority.

None of Altria's cases involve RICO plaintiffs passing on an overcharge. *See Steele v. Hosp. Corp. of Am.*, 36 F.3d 69, 70 (9th Cir. 1994) (no overbilling claim for patients who never paid medical fees); *Bokaie v. Green Earth Coffee LLC*, No. 18-CV-05244-JST, 2018 WL 6813212, at *6 (N.D. Cal. Dec. 27, 2018) (no injury to property where claim was based on diminution of value and nuisance had been abated). The overcharge here represents a direct harm that was not present in those cases.

Altria's argument also fails factually. Altria cites only to evidence that some Named Plaintiffs bought from individuals, rather than from retailers. Altria Pet. at 8. But that does not show that there are any class members who purchased from retail (*i.e.* are class members) and then resold all of the JUUL they purchased (and would be uninjured, according to Altria).

*(3) Plaintiffs do not allege personal injuries.*

Altria argues that Plaintiffs who purchased JUUL due to addiction have no claim because they cannot recover for personal injuries. Altria Pet. at 22. But Plaintiffs are not trying to recover for personal injuries through this class action. In *Varney v. R.J. Reynolds Tobacco Co.*, 118 F. Supp. 2d 63 (D. Mass. 2000), the plaintiffs sought a refund on the purchase of their cigarettes *because* they had been

injured by the product. *Id.* at 73. Here, there is no connection between any personal injuries and the Plaintiffs' class claims. Plaintiffs allege only economic injury based on a market-wide price premium. Therefore, all are similarly situated for purposes of the class. (*See* Order at 33-38, 79-80.)

*(4) Altria's "enterprise" argument is irrelevant to Rule 23.*

Altria's final argument is easily dismissed. Altria claims that the district court misapplied the definition of a RICO "enterprise." Altria Pet. at 23.While Altria argues that immediate review of this issue is needed "to correct 'fundamental issue[s] of law relating to class actions,'" *id.* at 25, citing *Chamberlan*, 402 F.3d at 959, it fails to explain how its argument relates to any ground for Rule 23 review. In fact, because all class RICO claims against Altria would fail if there was no enterprise, this is another common issue supporting certification.

The district court also did not err. Altria complains that in the typical case, the bad actors seize a legitimate firm and use it for "unlawful ends." Altria Pet. at 24. Yet, the statutory definition of "enterprise" includes corporations. 18 U.S.C. § 1961(4). And, it is immaterial whether a corporation is otherwise legitimate. *United States v. Rone*, 598 F.2d 564, 568 (9th Cir. 1979). This Court, therefore, should reject Altria's argument and deny the petition.

## III. Defendants "Death Knell" Arguments Do Not Support 23(f) Review.

JLI and the ODDs contend review is appropriate under the "death knell" doctrine. JLI Pet. at 25-26; ODD Pet. at 24-25. Generally, courts only entertain "death knell" arguments where the party has also shown that the district court erred. *See Chamberlan*, 402 F.3d at 960 ("In connection with the death knell factor, we normally would look for error in the certification order.") (citing *Blair v. Equifax Check Servs., Inc.*, 181 F.3d 832, 835 (7th Cir. 1999)). No such error has been established here.

As noted above, "Plaintiffs bring four 'types'" of fraud-based theories that underlie the claims that Defendants address in their petitions (RICO and California law UCL, CLRA and FAL): "(1) misrepresentations in advertising, (2) omissions in advertising, (3) misrepresentations on the product labels, and (4) omissions from the product labels." (Order at 17.) Defendants spend much of their petitions arguing, for example, that variability in JUUL advertising precludes certification. *E.g.* JLI Pet. at 2 (focusing on the district court's alleged failure to make findings concerning what "advertisements conveyed"); *id.* at 5-6 (discussing "JLI Advertising" but not labeling or omissions). But variability in advertising is irrelevant to omissions claims: JUUL marketing never disclosed what Plaintiffs allege are material information about the product's addictiveness and health risks. As they did at the district court, "Defendants do not directly engage with Plaintiffs'

omission-based theory . . . .” Order at 51 n.40. It is also irrelevant to labeling claims where the challenged misrepresentations and omissions are on the product label and have nothing to do with advertising.

As a result, most of Defendants’ arguments are irrelevant to many of the theories that supported the Court’s certification decision. Thus, even if Defendants’ critiques of the district court’s analysis of advertising misrepresentation claims had some validity (which they do not), they would provide no basis for decertifying the classes. Defendants’ challenges to only certain theories and claims in their petitions thus makes the petitions inapt for Rule 23(f) review, which would potentially delay the litigation without fundamentally changing the scope or remedies available to the certified classes.

Finally, Defendants also do not support their “death knell” claims with any evidence of revenue or assets. *See Chamberlan*, 402 F.3d at 960 (denying 23(f) petition where petitioner did not prove with “declarations, documents, or other evidence” that “it lacks the resources to defend this case to a conclusion and appeal”). As the *Chamberlan* court wrote, “the potential recovery here may be “unpleasant to a behemoth” company such as Altria or JLI, “but it is hardly terminal.” *Id.* Consequently, the district court’s certification order did not provide a “death knell” for this litigation.

## CONCLUSION

For the foregoing reasons, Defendants' petitions should be denied.

Dated: August 4, 2022

Respectfully submitted,

*_/s/ Dena Sharp_*
Dena C. Sharp (SBN 245869)
Scott Grzenczyk (SBN 279309)
**GIRARD SHARP LLP**
601 California Street, Suite 1500
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
dsharp@girardsharp.com
scottg@girardsharp.com

Sarah R. London
**LIEFF CABRASER HEIMANN & BERNSTEIN**
275 Battery Street, Fl. 29
San Francisco, CA 94111
Telephone: (415) 956-1000
slondon@lchb.com

Dean Kawamoto
**KELLER ROHRBACK L.L.P.**
1201 Third Ave., Ste. 3200
Seattle, WA 98101
Telephone: (206) 623-1900
dkawamoto@kellerrohrback.com

Ellen Relkin
**WEITZ & LUXENBERG**
700 Broadway
New York, NY 10003
Telephone: (212) 558-5500
erelkin@weitzlux.com

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 22-80061, 22-80062, and 22-80063

I am the attorney or self-represented party.

**This brief contains** 8,976 **words**, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ○ complies with the word limit of Cir. R. 32-1.
- ○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*
  - ○ it is a joint brief submitted by separately represented parties;
  - ○ a party or parties are filing a single brief in response to multiple briefs; or
  - ○ a party or parties are filing a single brief in response to a longer joint brief.
- ○ complies with the length limit designated by court order dated ____.
- ◉ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Dena C. Sharp **Date** Aug 4, 2022

*(use* "s/[typed name]" *to sign electronically-filed documents)*

**CERTIFICATE OF SERVICE for**
**Ninth Circuit Case Numbers 22-80061, 22-80062, and 22-80063**

I hereby certify that on August 4, 2022, I electronically filed the following document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system:

**PLAINTIFFS' CONSOLIDATED ANSWER IN OPPOSITION TO DEFENDANTS' PETITIONS FOR PERMISSION TO APPEAL GRANT OF CLASS CERTIFICATION PURSUANT TO FED. R. CIV. P. 23(F)**

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that I have caused the foregoing document to be emailed to the following counsel for Defendants:

| |
|---|
| Kouba, David E. David.Kouba@arnoldporter.com |
| Massaro, John John.Massaro@arnoldporter.com |
| Bernick, David M david.bernick@kirkland.com |
| Wilcox, Jason jason.wilcox@kirkland.com |
| Farrell, Peter A. pfarrell@kirkland.com |
| Smith, Renee D. rdsmith@kirkland.com |
| Guzman, Michael J. mguzman@kellogghansen.com |
| Schwarz, David L. dschwarz@kellogghansen.com |
| Derek Reinbold dreinbold@kellogghansen.com |
| Kramer, James N. jkramer@orrick.com |
| Eugene Illovsky Eugene@boersch-illovsky.com |

/s/ *Dena C. Sharp*
Dena C. Sharp